**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal No. 06-150 (JAG) |
| | ) |
| HAROLD MAISONET, | ) |
| Defendant. | ) |

GERTNER, D.J.

**MEMORANDUM AND ORDER RE: SENTENCING**
June 26, 2007

Harold Maisonet ("Maisonet") is charged in Counts One and Two of the Indictment with conspiracy to distribute in excess of five kilograms of cocaine under 21 U.S.C. §§ 841(a) and 846.  He pled guilty on March 14, 2007, agreeing that he participated in a conspiracy of that scope, but denying his responsibility for over five kilograms.  (There was no plea agreement.)[1]

---

[1] 21 U.S.C. § 841 created several offenses:  1) § 841(b)(1)(A) imposes a mandatory minimum sentence of ten years and a maximum sentence of life when the offense involves five kilograms or more of a substance containing cocaine. The minimum sentence is increased to twenty years "if death or serious bodily injury results" or if the defendant has a previous felony drug conviction.  2) § 841(b)(1)(B) imposes a mandatory minimum sentence of five years and a maximum of forty years if the offense involves 500 grams or more of a substance containing cocaine.  Again, death or serious bodily injury increases the mandatory minimum sentence to twenty years, and a previous felony drug conviction increases it to ten years.  3) Finally, § 841(b)(1)(C) is the catchall provision that imposes a maximum sentence of twenty years and no minimum sentence, without specifying particular amounts for most controlled substances.  The maximum is increased to thirty years with a prior felony drug conviction.  The minimum is set at twenty years and the maximum at life if death or serious bodily injury results.  In United States v. Malouf, I concluded that these categories comprised offenses requiring a jury trial, United States v. Malouf, 377 F. Supp. 2d 315 (D. Mass. 2005).  That holding was reversed in United States v. Malouf, 466 F. 3d 21 (1ˢᵗ Cir. 2007).  More recently, Judge Young held similarly in United States v. Griffin, No. 05-10175-WGY, 2007 WL 1620526, *13-*14 (D. Mass. June 6, 2007) based on the Supreme Court's decision in Cunningham v. California, 549 U.S. __ (2007).

Codefendant, Uriel Melendez ("Melendez") was charged with the
same offense.

The parties presented diametrically opposed views of the
defendant and his role in the offense. The government argued
Maisonet was an organizer of a substantial drug conspiracy,
conspiring to distribute 50 kilograms over time, even trying to
avoid detection by bringing a seven year old boy to a drug
negotiation. The resulting sentence it urged was 151 months,
nearly two years over the ten-year mandatory minimum.

The defense argued that Maisonet was a first offender, with
no contacts in drug trafficking and no resources to accomplish
anything remotely like a 50-kilogram deal.  He was responsible
for the distribution of one kilogram of cocaine, the amount
covered by the cash he had with him when the deal was to be
consummated, not the amounts the Cooperating Sources ("CS")
pressed in their conversations with him.  And he denied "using" a
seven year old boy to escape detection.  The seven year old boy
was his son who happened to be with him on the day of a meeting.
The sentence Maisonet argued for was 51 months.

But there was a third story, largely supplied by probation
in its presentence report.  This was a reverse sting.  The
*government* provided the drugs; *its* CS's were the people who
pressed for a 50-kilogram drug purchase.  And after Maisonet
turned one CS down multiple times and made it abundantly clear

-2-

that he could not possibly buy that amount, the CS offered to sell less, only if Maisonet and whomever he enlisted, signed on to buy the full 50 kilograms in the future.  Indeed, the government's arrangements seemed totally contrived – an installment purchase for 50 kilograms, over whatever period of time and for whatever period that Maisonet and Melendez and whomever their associates were could manage it.  If there were organizers or leaders in this enterprise at all, it was the government, not Maisonet, led by the CS's, on the one hand, and Maisonet's codefendant, Melendez, on the other, who soon became a cooperating witness.  Melendez *was* in fact a major drug dealer, which is why his cooperation was valued.  In the final analysis, all the government appeared to have accomplished was to ensnare a hapless first offender, Maisonet, in a web that it constructed.

After a two-day hearing, I concluded that the mandatory minimum did not apply, that the safety valve did, and I sentenced Maisonet to a sentence within the Guidelines of 41 months.

Most of this decision – as with most sentencing decisions -- deals with fact finding to determine the applicability of the statutory mandatory minimum and if so, whether the defendant fits the standards of the "safety valve," 18 U.S.C. § 3553(f), United States Sentencing Commission, Guidelines Manual (U.S.S.G.)§§ 2D1.1(b)(6), 5C1.2.  The safety valve enables first offenders who meet certain criterion to escape the rigors of the statute.

-3-

After the hearing, I found that the government's case on quantity – the 50 kilogram argument – wholly failed to persuade by a fair preponderance of the evidence.  Its case on defendant's role was contradicted by its own record, and belied by the language and purpose of the Guidelines' role adjustment provisions, U.S.S.G. § 3B1.1.  And as far as Maisonet's proffer, the truthful statement he is required to give to qualify for the safety valve, was concerned, I found that inconsistencies noted by the government between it and an earlier statement were more likely the government's record keeping problems than defendant's lack of candor.  I concluded that the defendant did meet the standards of the safety valve.

I then had to address the question of what the appropriate sentence should be, and the issues raised by the Guidelines and United States v. Booker, 543 U.S. 220 (2005).  And while the Supreme Court's decision in Rita v. United States, 2007 U.S. Lexis 8269 (June 21, 2007) was issued after the sentencing in this case, my analysis and approach here is entirely consistent with it.

The sentence I imposed here was a Guideline sentence, not because I found the Guidelines presumptively reasonable; I did not, and under Rita, I should not.  I have elsewhere noted instances in which particular Guidelines swept too broadly, including within the same category both the very culpable and

-4-

far, far less culpable individuals.  <u>See</u> <u>United States v. Ennis</u>,
468 F. Supp. 2d 228 (D. Mass. 2006) (limitations of career
offender provisions, U.S.S.G. § 4B1.1), <u>United States v.
Germosen</u>, 473 F. Supp. 2d 221 (D. Mass. 2007)(limitations of
aberrant conduct guidelines, U.S.S.G. § 5K2.20), <u>United States v.
Lacy</u>, 99 F. Supp. 2d 108, 116 (D. Mass. 2000) (limitations of
drug quantity as a proxy for culpability).

I applied a Guideline sentence because the only detailed
information I had was information about the *offense* not the
*offender*.  A judge cannot begin to consider a non-Guideline
sentence under <u>Booker</u> or <u>Rita</u> unless lawyers argue for one and
present evidence supporting it.  Even as to the offense, counsel
provided no context for Maisonet's actions e.g., why he decided
to follow up on the CS's offer, whether there is any evidence
from his lifestyle, his resources, that he is a drug dealer.
Counsel here focused on the drug quantity and other Guideline
categories but did not develop a record on anything else.[2]

In short, to reject the Guideline sentence on this record
was tantamount to saying – "I believe that drug sentences for
non-violent offenders are far too harsh."  In fact, I *do* believe
they are too harsh.  But my personal views are not relevant, I

---

[2] <u>See</u> <u>also</u> <u>United States v. Ennis</u>, 468 F. Supp. 2d 228, 236 (D. Mass. 2006)
(comparing a 20 year sentence for drug distribution with like Guideline
sentences for sexual abuse, sexual exploitation of children, seditious
conspiracy, torture, etc.).

-5-

needed evidence that <u>this</u> sentence was inappropriate punishment for <u>this</u> man.  As the Supreme Court said in <u>Koon v. United States</u>, 518 U.S. 81 (1996), "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  <u>Id.</u> at 113.

I.   **<u>FACTS</u>**

The following information derives from the presentence report, uncontested by either party, the exhibits, or testimony at the two-day sentencing hearing.

Harold Maisonet has worked all of his life, in a variety of jobs, including selling cars.  He lives modestly in a low-middle class community located in the mountainous area of Bayamon, Puerto Rico.  He supports his families: He was married once, and had two children, ages 11 and 10.  Now divorced, he is in a committed relationship with another woman with whom he also has a child, age 7.  At 35, he has absolutely no record except for a minor infraction at Disney World over a decade ago.  He completed high school and two years of college in business administration from Inter American University.

In connection with his work selling automobiles, he met a CS named Eliezer.  Eliezer and Maisonet bought cars and sold them to

third parties.  Over the course of a year, they even purchased
cars for resale to the other's clients.  During this same period,
Eliezer repeatedly tried to interest Maisonet in purchasing
cocaine, although nothing about Maisonet's past suggested he had
ever done so before.

Maisonet turned him down, at least twice.[3] Eliezer indicated
that he had a "friend from Colombia," a man named "El Viejo," who
had some business to do and who wanted "to be introduce[d] to a
friend."  "El Viejo", as it turned out, was also a CS.

Four months later, in March of 2006, when Maisonet was at
the home of Uriel Melendez, whom he had known for six years,
Maisonet mentioned Eliezer's proposal.  Melendez, who was a drug
dealer, and who did have the contacts and resources that Maisonet
lacked, asked to be introduced to Eliezer.  It is uncontested
that without Uriel Melendez – now also cooperating with the
government – Maisonet was wholly unable to "do" the deal.
(Indeed, as described below, it is not clear the deal could be
"done" even *with* Melendez' support).

There were no tapes of the CS's efforts to get Maisonet
involved.  Drug Enforcement Administration ("DEA") Special Agent
Jose Medina ("Medina") stated that the government does not tape
anything until the deal is struck.  The CS's are not monitored by

---

[3] The presentence report indicates that Eliezer made the offer after they had
done business together for six months and again in November 2005.  It was not
until February 2006 that Maisonet took the bait.

the DEA at all until that point.  They could go after anyone they chose to, a dealer or, as with Maisonet, a potential one, dangling the government's drugs in front of whomever would "bite."

Over the next month, between March 3, 2006 and April 22, 2006, Maisonet met with Melendez and the CS's and made numerous phone calls.  Law enforcement agents recorded the meetings and calls.  El Viejo informed Melendez and Maisonet that he had 50 kilograms available to sell and that he would "only" sell it in its entirety for $500,000, a sort of "take it or leave it" approach.  Maisonet indicated that he was "interested" but needed time to reach out to associates.  Trial Exhibit (Exh.) 3.

Indeed, he kept on calling the CS precisely because he was having trouble getting the money together.  At one point, Melendez told Maisonet to inform the two CS's that Melendez had acquired $150,000 as an "advance" on the 50 kilograms and would come up with the rest at a later date.  Exh. 4.  In fact, Melendez only had $15,000.  Although Maisonet called the CS's numbers of times in this period, it is abundantly clear that Maisonet was Melendez's mouthpiece.  He was nothing more than a "go between" for Melendez, for unclear gain.  Melendez, he said, "was going to pay him an unknown amount in compensation if the deal was successful."  Exh. 3.

From these conversations, the government seeks to paint a portrait of Maisonet sufficient to justify its 151 month sentencing recommendation – holding him fully responsible for 50 kilograms, not to mention a host of other enhancements.  The problem was that the government never introduced the transcripts of the telephone conversations on which its arguments were based. The one transcript it did offer, the recording of an April meeting with Melendez and Maisonet, was incomprehensible.  The transcript had four references to UM's – unidentified males. What the government did not do was to offer any testimony as to who those males were or who said what to whom.  All that the agent could say was that Eliezer, El Viejo and Melendez did most of the talking – not Maisonet.

When the deal finally took place on April 22, 2006, Maisonet had only $13,870, given to him by Melendez, enough for one kilogram.  Exh. 4.  Melendez had no money when he was arrested, not the $150,000 that he had Maisonet promise the CS's.

To be sure, according to the agent's account of the interviews following Maisonet's arrest and his proffer interview, there was another potential source of funds.  In the April 22, 2006, interview, Maisonet mentioned that he had also turned over a PT Cruiser to Eliezer as part of the down payment.  The DEA's account of Maisonet's proffer on June 6, 2007, however, reports that Maisonet turned over the PT Cruiser to El Viejo, not

Eliezer, but that El Viejo had agreed to pay for the vehicle "upon completion of the drug transaction." Exh. 4, p. 2. The PT Cruiser, according to the proffer account, was not a part of the drug deal at all, but a separate transaction. And while Agent Messina said that the PT Cruiser was mentioned in the overheard conversations, the transcript of that conversation was never offered.

There are several problems with the agent's account of Maisonet's proffer. First, the agent acknowledged that Maisonet talked about his car dealings with Eliezer over the year that they worked together, as part of Maisonet's explanation for the PT Cruiser. The agent admitted that he had not written any of this down, because he did not think that "auto sales" were pertinent. Second, the proffer notes that the recipient of the PT Cruiser was El Viejo not Eliezer. There is no indication why El Viejo would have received the car, rather than Eliezer with whom Maisonet dealt cars. Nor was there any evidence as to the value of the PT Cruiser, its condition, its year. Nor was the car even mentioned in any of the overheard conversations,[4] except for one, and that reference (recounted through the agent) was

---

[4] In the same statement, Exh. 3 (Statement of April 22, 2007) Maisonet reports that Melendez told him to tell El Viejo and Eliezer that evening – reportedly after this car was turned over – that the $150,000 was ready – which was not true. In any event, there was no apparent adjustment in the price for the car. As described above, the evidence of the car was poorly presented, internally inconsistent, and made no sense.

ambiguous.[5]  Rather than suggesting a precise amount of drugs
bargained for in exchange for the car, the record underscores the
overall chaos of the transaction.  All that was clear – even by a
preponderance of the evidence - was that Maisonet had a finite
amount of money –- albeit Melendez's money -- for a single
kilogram.  He should only be held responsible for that.

A.  **The Guidelines**

In its sentencing memorandum, the government argued the
following:

> 1.  That Maisonet was responsible for 50
>     kilograms, an offense level of 36 under
>     U.S.S.G. § 2D1.1(a)(3) and (c)(4).
>
> 2.  That Maisonet should get an increase
>     under U.S.S.G. § 3B1.1 because he was an
>     'organizer' of the transaction,
>     increasing the base offense by two.
>
> 3.  That since the defendant used or
>     attempted to use a person less than
>     eighteen years of age 'to assist in
>     avoiding detection' of the offense, the
>     base offense should be increased by two
>     more levels under U.S.S.G. § 3B1.4.

As a result, Maisonet's adjusted offense level, with the
acceptance of responsibility deduction, would be 34 or 151 to 188
months with a Criminal History category of I.

---

[5] Messina stated that Maisonet offered El Viejo a fully paid-off car.  El
Viejo, however, replied, according to Messina's testimony, "I don't want it
until we are ready to complete the transaction."  Without the transcript or
the tape of this conversation, it is impossible to understand the context of
this comment.

Defendant did not file a sentencing memorandum.  In his objections and orally, he argued for one kilogram, no role adjustment, safety valve, and indeed a sentence under the mandatory minimum, 51 months.[6]

**B.    Quantity**

The government offered Agent Messina's testimony.  He produced the DEA's account of the defendant's statement in April of 2006 (Exh. 3), the DEA's account of the June 6, 2007 proffer (Exh. 4), a videotape of surveillance (Exh. 1), and a transcript of an overheard conversation (Exh. 2).  The transcript, as described above, was not helpful since the government did not bother to identify at the hearing which unidentified male (UM) was speaking, although it indicated that most of the talking was done by Melendez, Eliezer, El Viejo – and not Maisonet.  Given

---

[6] The plea defined the maximum (for which a jury would otherwise be required), judicial fact findings could determine the statutory minimum mandatory sentence, and if not applicable, the actual sentence to be imposed.  In United States v. Perez-Ruiz, 353 F.3d 1 (1st Cir. 2003), the court held that Apprendi v. New Jersey, 530 U.S. 466 (2000), does not preclude judicial fact findings (including findings as to drug type and quantity) that increase a defendant's sentence under 21 U.S.C. § 841, so long as the sentence remains within the default statutory maximum.  See 353 F.3d at 15.  A conspiracy charge, like the one at issue here (and in Perez-Ruiz), is particularly complex.  A judge is obliged to sentence according to the drug amounts individually attributable to the defendant, "so long as the sentence falls within the statutory maximum made applicable by the jury's conspiracy-wide drug quantity determination."  Id. (citing Derman v. United States, 298 F.3d 34, 43 (1st Cir. 2002)); see also Edwards v. United States, 523 U.S. 511, 515 (1998) (since the court sentenced defendant within the statutory maximum applicable to the conspiracy, it could determine both the amount and the kind of controlled substances for which the defendant was held responsible).  See, e.g., United States v. Goodine, 326 F.3d 26, 28, 32 (1st Cir. 2003), cert. denied 541 U.S. 902, (holding that drug quantity in § 841 is a "mere sentencing factor," and "a judge's determination of drug quantity can influence the mandatory minimum sentence imposed . . . . ") This conclusion was affirmed in United States v. Malouf, supra at n.1.

Maisonet's background, that was not surprising.  Nor did the
government offer the tapes of any of the telephone conversations.

On this record, the government's argument that Maisonet was
responsible for 50 kilograms makes no sense - not only because
there was no evidence as to who said what, or the particular
words used, but more importantly because it is clear from
uncontested facts in the presentence report that Maisonet had no
ability to raise the money for drugs of that quantity.

Indeed, under U.S.S.G. § 2D1.1 n. 12, the Guidelines
provide:

> . . . [I]n a reverse sting, the agreed-upon
> quantity of the controlled substance would
> more accurately reflect the scale of the
> offense because the amount actually delivered
> is controlled by the government, not by the
> defendant.  If, however, the defendant
> establishes that the defendant did not intend
> to provide or purchase, *or was not reasonably
> capable of providing or purchasing*, the
> agreed-upon quantity of the controlled
> substance, the court shall exclude from the
> offense level determination the amount of
> controlled substance that the defendant
> establishes that the defendant did not intend
> to provide or purchase and *was not reasonably
> capable of providing or purchasing*.[7]

---

[7] Although counsel did not argue for it, the transaction had all the earmarks
of sentencing entrapment.  U.S.S.G. § 2D1.1 n. 14 notes: "If in a reverse
sting . . ., the court finds that the government agent set a price for the
controlled substance that was substantially below the market value of the
controlled substance, thereby leading to the defendant's purchase of a
significantly greater quantity of the controlled substance than his available
resources would have allowed him to purchase except for the artificially low
price set by the government agent, a downward departure is warranted."  Here
the transaction was not a traditional market transaction because the CS
permitted an installment purchase of the drugs – putting roughly $15,000 down
for one kilogram and perhaps taking more drugs to show to their associates.
Such a transaction, the agent explained, was not unusual where one of the

The only quantity I could find with any certainty was the quantity that can be inferred from the final deal, not the puffing on overheard conversations.  There were allegedly two parts to the final transaction.  First, the cash Maisonet had on him -- $13,780 and second, the car supposedly delivered the day before the transaction as a down payment.

I will not consider the car in this calculation. As noted above, there was no meaningful evidence about the car, or what it was worth, or how it figured into the transaction.  Even if I accept that the car was part of the transaction, based on Maisonet's first statement, I have no information as to what that meant in drug quantity terms.  And if the recipient was Eliezer, at the very least, I am persuaded that their legitimate dealings over cars – quite apart from drugs – were long standing and complicated.

I cannot make a finding of 2 kilograms on this record.

## C.  **Use of a Minor to Avoid Detection**

The government argued that Maisonet met with the CS to view the cocaine with a minor child.  It claims that the meeting was arranged to take place in a public grocery parking lot to avoid detection and the government added, "[b]y bringing a minor child, defendant attempted to add to the disguise that he was at the

---

participants was vouching for the defendant.  Fair enough, but here the "voucher" was a government agent. The question, of course, is whether ordinary drug dealers – as opposed to government financed drug dealers – would have vouched for a complete unknown, like Maisonet.

grocery parking lot running everyday errands, thereby avoiding
law enforcement authorities."  Because the agents did not see
Maisonet enter any of the stores to run errands, it argues that
the presence of the child was a ruse.

The government's argument is absurd.  Exhibit 4 suggests
that the CS showed Maisonet the kilograms of cocaine
"unexpectedly" at a shopping mall.  The seven year old child that
was with him was his son.  This hardly meets the definition of
"using a minor to commit a crime" under U.S.S.G. § 3B1.4.[8]  While
the Guideline adjustment about minors is barely explained in the
Manual, it is clear that it has been used when younger
individuals are part and parcel of the illegal event, such as
when they are used as "go-betweens," or where a child was used as
security while defendant went to get the drugs, see United States
v. Warner, 204 F. 3d 799, 800-01 (8th Cir. 2000).  It is not
appropriate where a child happened to be in the car with his
parent.  See United States v. Jimenez, 300 F. 3d 1166, 1170 (9th
Cir. 2002)("Absent other evidence, the 'mere presence of a minor'
is insufficient to support the application of § 3B1.4")(quoting
United States v. Castro-Hernandez, 258 F. 3d 1057, 1060 (9th Cir.
2001)).

---

[8] The Guideline provides: "If the defendant used or attempted to use a person
less than eighteen years of age to commit the offense or assist in avoiding
detection of, or apprehension for, the offense, increase by 2 levels."  §
3B1.4.

D.    <u>Role</u>

The government argues for an increased role adjustment.

Section 3B1.1 provides for an increase in the offense level when

the defendant is:

> a) an organizer or leader of a criminal
> activity that involved five or more
> participants or that was otherwise extensive
> (an increase of four levels),
>
> b) a manager or supervisor (but not an
> organizer or leader) and the criminal
> activity involved five or more participants
> or was otherwise extensive (an increase of
> three levels), or
>
> c) if the defendant was "an organizer,
> leader, manager, or supervisor in any
> criminal activity other than that described
> in (a) or (b)" (an increase of two levels).
> <u>See</u> U.S.S.G. § 3B1.1(a-c).  Unlike other
> sections, the role adjustment provision does
> connect this enhancement to concerns about
> culpability, public safety, and recidivism:
>
> This adjustment is included primarily because
> of concerns about relative responsibility.
> However, it is also likely that persons who
> exercise a supervisory or managerial role in
> the commission of an offense tend to profit
> more from it and present a greater danger to
> the public and/or are more likely to
> recidivate.  The Commission's intent is that
> this adjustment should increase with both the
> size of the organization and the degree of
> defendant's responsibility.

-16-

U.S.S.G. § 3B1.1, cmt. (backg'd).  Moreover, the Guidelines also indicate that the significance of relative responsibility diminishes in a small organization.[9]  Id.

A role adjustment makes absolutely no sense in this situation.  There is no evidence how much Maisonet stood to profit more from this enterprise. Melendez was to pay him an "unknown amount of money" according to Maisonet's statement at the time of his arrest.  He described himself as a "go between" as between Eliezer, "El Viejo" and Melendez, a characterization that comports with the evidence.  While the government represents that he was responsible for the details, that most of the conversations they recorded during the month were Maisonet's – there was no evidence of that at sentencing.  Not one of these transcripts was introduced.  Moreover, even if there were evidence, it hardly takes much to organize a drug transaction where someone else -- Melendez -- is providing the money and telling you what to do.

I decline to add a role adjustment in this case.

Without a role adjustment, and with a finding of one kilogram, and no criminal record, the Guideline range is 51 to 63

---

[9] Section 3B1.1 directs the Court to look at the "real offense" and consider a number of factors, including (but obviously not limited to): "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1, cmt. n.4.

months.  That range, however, is trumped by the mandatory
minimum, to which I must now turn.

**E.   <u>Safety Valve and Mandatory Minimum</u>**

Maisonet is eligible for consideration of a below mandatory
minimum sentence so long as he meets the requirements of the
safety valve -- § 5C1.2, no more than one criminal history point,
no threats of violence, no death or bodily injury, not an
organizer, and a truthful proffer.

The only contested factor remaining in this calculus is
whether Maisonet's June 6, 2007 proffer was accurate.  The
government claims it was not, pointing to several inconsistencies
between it and his earlier statement.  The only significant
discrepancy is Maisonet's description of what a PT Cruiser
allegedly turned over to one of the CS's before his arrest was
for – whether a down payment on further drug transactions, and
thus, the basis for inferring a more substantial drug quantity,
or whether it was an independent transaction.

As described above, the agent admitted that he had not
written down most of what Maisonet said in his proffer about his
complicated dealings with Eliezer, with whom he had been involved
in many transactions the car business, buying and selling cars
over a period of a year.  A car was mentioned in one of the
overheard conversations according to Messina, but without a

transcript, with only Messina's vague account, the context was ambiguous.

I do not credit the government's account of the terms of the proffer session, at least with respect to the PT Cruiser and its significance.  Since I cannot count on the accuracy of the agent's rendition of Maisonet's proffer, I cannot conclude that Maisonet was not truthful as to this issue.

### F.   **The Sentence**

At this point the advisory guidelines point to 41 to 51 months, based on an total offense level of 22, criminal history I.[10]  As I said in United States v. Jaber, 362 F. Supp. 2d 365, 368 (D. Mass. 2005), an analysis unaffected by the Supreme Court's latest decision in Rita, "advisory" does not mean a return to the standardless sentencing which preceded the SRA.  I called the standardless approach the "free at last" mentality characterized by comments like, "I will not sentence according to the Guidelines because I simply do not agree that this or that offense deserves such severe penalties."[11]

---

[10] The computations are as follows: drug quantity of one kilogram **(26)**, minus two for acceptance of responsibility **(24)**, minus two more for the safety valve **(22)**.

[11] In United States v. Gonzalez, No. 03-10027, the defendant plead guilty to illegal reentry after deportation and passing false social security cards. The applicable statute, 8 U.S.C. § 1326, already distinguished between defendants who had simply reentered the country, and those who did so after conviction of a crime.  Mr. Gonzalez's reentry had not followed the conviction of a crime.  Counsel did nothing to individualize Mr. Gonzalez (i.e., to suggest why he was different from all others in that category of offense).  In my judgment, her argument translated into -- "I don't agree that people who have committed these offenses ought be punished so severely."  While I agreed

Nor does "advisory" mean slavish application of the Guidelines under the guise of fair "consideration," an approach which is now unconstitutional, or giving the Guidelines a presumption of validity, which effectively means making them mandatory.  <u>Rita v. United States</u>, slip op. 11, p. 12.  <u>See</u> <u>also</u> Judge Nancy Gertner, *Thoughts on Reasonableness*, 19 Fed. Sent. R. 165 (February 2007).  "Advisory" means something in-between.

The problem is that I cannot exercise my discretion unless I have the evidence to do so.  Put otherwise, I am Guidelines-bound, for the most part, when the advocates (and to a lesser degree, Probation) are Guidelines-bound.  While I have independent obligations to enforce a just sentence, in the final analysis, this is an adversary system.

In the instant case, there was no information – beyond the presentence report – about the context of this offense, why Maisonet fell prey to this deal at this time.  Nor was there any information about Maisonet's relationship with his three children and how his incarceration would affect that, the significance of his second child's illness and his role in that child's care, whether he was the sole support of both families, what Maisonet has been doing since the time of his arrest and the sentencing, why a sentence of four years is necessary to deter him, since he

---

with counsel's predilections, I rejected that approach.  It was not a judgment for me to make, so I sentenced according to the Guidelines.

-20-

has never before been imprisoned.  (Indeed, in its papers, at the outset of the hearing, defense counsel was only seeking a sentence of 51 months which was an error, failing to count the safety valve adjustment under § 2D1.1(b)(7).)  It was not until after I pronounced sentence that defendant argued for something less.  Too little; too late.

To accept defendant's argument on this record would be tantamount to saying: First offenders, who work and have families, should not get time even when their first transaction is as substantial as one kilogram of cocaine.  In fact, I believe that may well be true -- 41 months is far too severe for a first offender, someone who was never before imprisoned, even one who toyed with the idea of a more substantial drug transaction.[12]  But given the paucity of this record, I cannot base this sentence on that belief.

Just as the government's record for its onerous sentence of over ten years was patently inadequate, so was the defendant's last minute argument for a sentence lower than 41 months. Based on the record at hand, I find that the Guideline sentence of 41 months meets the strictures of 18 U.S.C. § 3553(a).

**SO ORDERED.**

**Date:  June 26, 2007**          /s/Nancy Gertner
                              **NANCY GERTNER, U.S.D.C.**

_____

[12] See United States v. Germosen, supra.

-21-